UNITED STATES OF AMERICA      )
                                       )
         v.                         )                    **2:13-cr-00146**
                                         )
LUIS PECINA                            )

## <u>OPINION AND ORDER</u>

Luis Pecina is charged with possessing methamphetamine with the intent to distribute it. He seeks suppression of the drugs seized from his car in a traffic stop as well as statements he subsequently made to the police. Pecina was a passenger in the car when it was stopped by Hammond Police Officer Dan Young. Pecina exited the car and very briefly tried to elude Officer Young, which prompted Pecina's detention. After placing Pecina in his police car, Officer Young talked to the driver of the stopped car, Jenny Valenzuela. Officer Young testified that he smelled the odor of marijuana coming from the car, so he searched it, finding a mostly-consumed marijuana cigar and a large quantity of crystal methamphetamine. Pecina has moved to suppress these items and the statements he made to the police after his arrest.

Whether Officer Young smelled the odor of marijuana coming from the car is the fulcrum of my decision: if he did, the search of the car was legal. Based on the evidence presented during the hearing and in the parties' initial and supplemental briefing, I find that Officer Young effected a legal traffic stop, he lawfully detained Pecina, he smelled

marijuana, and he lawfully searched the car. For those reasons, neither the physical evidence found in the car nor Pecina's statements will be suppressed.

## FACTUAL BACKGROUND

Early on the morning of November 14, 2013 defendant Luis Pecina picked up Jenny Valenzuela, with whom he has a child, in a black Dodge Charger. Valenzuela took the wheel, and they went looking for a hotel room. (Tr. Vol. 1[1] at 9, 68-69, 75, 84, 117; Ex. A at 2-3; DE 21 at 1.) They first went to a Best Western in Hammond near I-94 but found it to be too expensive, so they drove to the Motel 6 next door. (Tr. Vol. 1 at 14-15, 70.) Valenzuela testified that she knows she signaled the turn into the Motel 6 because she "frequently" uses her turn signals. (Tr. Vol. 1 at 70.) Valenzuela testified that she and Pecina hadn't smoked marijuana that day, and the car didn't smell of marijuana, although they did plan to smoke some at the hotel. (Tr. Vol. 1 at 70-71.) Valenzuela also testified that they did not yet have any marijuana and she didn't know where they were going to get it. (Tr. Vol. 1 at 85.)

That same morning, Detective Sergeant Dan Young was in uniform and on patrol in an unmarked police car (but that was equipped with lights and siren) conducting a routine check of a string of hotels off the highway in south Hammond. (Ex. A at 2; Tr. Vol. 1 at 9, 11, 19, 89-90.) Officer Young was familiar with the area as the site of previous investigations related to narcotics, prostitution, counterfeiting, robbery, and potential

---

[1] Because the hearing occurred in three parts there are three separate transcripts. These are cited as volumes 1, 2 and 3, numbered in chronological order. They are entered in the docket as Docket Entries 46, 50 and 51, respectively.

human trafficking. (Tr. Vol. 1 at 10.) In the Best Western parking lot Officer Young saw a black Dodge Charger with heavily tinted rear and rear passenger windows, so dark that they appeared to violate state law because he couldn't see inside to identify occupants or see if they were wearing seatbelts. (Ex. A at 2; Tr. Vol. 1 at 12, 42-43; Tr. Vol. 2 at 12-13.) The defense presented photographs of the Charger's front windshield and front side windows (Ex. C), and some of the contents of the car (Ex. D), but neither side presented clear photos showing the car's other windows. The still photos from the surveillance video (Ex. J-O) aren't of a quality to really show how tinted the rear three windows are. Noticing that no one immediately left the vehicle when it parked, Officer Young wanted to see if the occupants had identified his car as a police vehicle and had parked only to avoid his attention. He left the parking lot and positioned himself one block away, where he could see the only exit from the Best Western parking lot. (Ex. A at 2; Tr. Vol. 1 at 13-14.) Less than five minutes later Officer Young saw the Charger leave the Best Western parking lot, travel a short distance, and, after appearing to him to notice the police vehicle, quickly turn into the Motel 6 parking lot without using a turn signal.[2] (Ex. A at 2; Tr. Vol. 1 at 14-15.) He activated his police lights and turned into the Motel 6 to make a traffic stop. (Ex. A at 2; Tr. Vol. 1 at 16.)

At this point the two storylines collide. Once the Charger and the police car pulled into the Motel 6 parking lot, three inconsistent versions of events developed:

_____

[2] Officer Young later issued a written confirmation of the verbal warning to Valenzuela for failure to signal a turn. (Ex. 7; Tr. Vol. 2 at 13-15.)

Officer Young's, Valenzuela's, and the Motel 6 surveillance video (Ex. G, Cam21 video file — referred to as Ex. G, with the relevant time from the white time counter at the top-center of the video). During the hearing and in briefing Pecina has attempted to pick apart Officer Young's police report (Ex. A) and testimony. While there are demonstrable inaccuracies in certain details of Officer Young's testimony about the traffic stop, I found Officer Young to be a credible witness. The inaccuracies did not seem to be deliberate, and I attribute them to adrenaline and the frailty inherent in human memory. This is particularly true given that only about 18 seconds passed between the shadow of the Charger appearing in the video to Pecina putting his hands up and laying down on the ground at Officer Young's command, with many more details arising than seconds passing. The bottom line is that the bulk of Officer Young's testimony is corroborated by the surveillance video.

The Charger parked in the Motel 6 lot, and the passenger door opened about three seconds after the car stopped moving. (Ex. G at 7:40:5-7:40:8.) As Pecina emerged from the front passenger door of the Charger, Officer Young pulled his police car up behind the Charger. (Ex. G at 7:40:8.)

Officer Young testified that his car's police lights were on when he pulled up and stopped his car (Tr. Vol. 1 at 16), and a review of the video confirms this. (Ex. G at 7:40:9.) Valenzuela stated several times in her testimony that she was absolutely certain the police lights weren't on (Tr. Vol. 1 at 88-89), the final time confirming that she wasn't simply saying she didn't remember:

> THE COURT:     Let me clarify. Are you saying he did
>                not have his lights on?
> A [VALENZUELA]:Yes.
> THE COURT:     Or are you simply saying you don't
>                know?
> A [VALENZUELA]:No, he didn't have his lights on. Yeah.

(Tr. Vol. 1 at 88:25-89:4.) This is despite the fact that, when she was eventually ordered

out of the Charger, Valenzuela stood in front of Officer Young's car with her hands on

the hood, facing the windshield and its lights, for almost three minutes, and the video

shows the police lights had been on continuously from the beginning of the stop. (Ex. G

at 7:45:49-7:48:43.)

Officer Young testified that, as he pulled up and stopped his car, he saw Pecina

get out of the passenger side of the Charger and begin to walk away. (Tr. Vol. 1 at 18-

19.) The video shows that Pecina got out and started to move towards the back of the

Charger (where the police car was), then it seems he saw the police vehicle, and he

stepped backwards away from it, then turned, moving towards the front of the Charger

and away from the police car. (Ex. G at 7:40:8-7:40:10; Ex. 8; Tr. Vol. 2 at 19.) Officer

Young testified that "from his behavior and my training, experience, I was expecting

him to take off running and that level of resistance." (Tr. Vol. 1 at 20.) Officer Young

stated that, as a result, he got out of his car and at least three times ordered Pecina to

stop while he ran after Pecina, pulling out his gun as he ran. (Tr. Vol. 1 at 20-21.)

Valenzuela agreed that Officer Young got out of his car and ordered Pecina to stop. (Tr.

Vol. 1 at 89.)

Apparently before having seen the surveillance video, Officer Young testified that he ran right next to the Charger and past Pecina's still-open car door, detecting a strong odor of marijuana coming from the Charger as he passed. (Tr. Vol. 1 at 19-21, 25.) Officer Young stated during cross-examination that he was unsure of certain spatial details of the traffic stop, like exactly which parking spot the Charger was in, or how many parking spots Pecina traveled away from the Charger before stopping. (Tr. Vol. 1 at 38, 40, 41.)

In fact, the video shows that Pecina closed his door, and that Officer Young ran towards the passenger side of the Charger, then side-stepped and went around the car to its right rather than directly by the Charger. (Ex. G at 7:40:10-7:40:14.) Pecina quickly stopped moving away from the police car and put his hands up, standing in front of the Charger, then lay down on the ground. (Tr. Vol. 1 at 21; Ex. G at 7:40:13-7:40:16.) As he was being handcuffed Pecina spontaneously said "it's me, it's me." (Tr. Vol. 1 at 22.)

Officer Young put Pecina in the back of the police car. (Tr. Vol. 1 at 25.) Once Pecina was there Officer Young asked Pecina for his name, date of birth, and age. Pecina provided what turned out to be a false name, and a date of birth that didn't match the age he gave. (Tr. Vol. 1 at 26-27.) Although the video can't confirm the contents of the conversation, it does confirm its brevity: Officer Young put Pecina in the police car and stood at the car for less than a minute before walking to the Charger. (Ex. G at 7:42:12-7:43:0.)

After talking to Pecina briefly, Officer Young moved to the Charger's driver's door, where he talked to Valenzuela through the open door. (Ex. G at 7:43:8; Tr. Vol. 1 at 27.) Officer Young testified that, as he stood by the open door, he smelled burnt marijuana. (Tr. Vol. 1 at 29-30.) Valenzuela gave Officer Young her Arizona driver's license, but didn't have the car's registration. She also gave Officer Young Pecina's Arizona driver's license. (Tr. Vol. 1 at 28, 91.) Once Officer Young's backup arrived, Officer Young asked Valenzuela to get out of the Charger, and she stood with Officer Maldonado with her hands on the hood of Officer Young's car. (Ex. G at 7:45:49; Tr. Vol. 1 at 29.)

As soon as Valenzuela was out of the Charger, the video shows Officer Young squatting by the open driver's door, apparently searching around the driver's seat for a little more than two minutes. (Ex. G at 7:45:42-7:48:2.) Officer Young then went back to his car and seemed to confer with Officer Maldonado briefly, after which Officer Maldonado took Valenzuela towards his own police car. (Ex. G at 7:48:42.)

Less than a minute later Officer Young returned to the Charger to search it, now starting on the passenger's side. (Ex. G at 7:49:21; Tr. Vol. 2 at 18; Ex. A at 3.) Officer Young's police report and testimony before watching the video omitted the initial search of the driver's side, indicating that the search began on the passenger's side. (Ex. A at 3; Tr. Vol. 1 at 30.) In the search Officer Young found a plastic grocery bag containing a Swiss Miss Hot Chocolate box that held four bags of what Officer Young believed was crystal methamphetamine. (Tr. Vol. 1 at 30; Ex. A at 4.) A later test

indicated that the substance was crystal methamphetamine. (Tr. Vol. 1 at 31; Ex. A at 5.) In the driver's side door panel of the Charger Officer Young found a cigar that looked like it had been mostly smoked. It smelled of burnt marijuana and contained what appeared to Officer Young to be raw marijuana. (Tr. Vol. 1 a 31; Ex. A at 4.) The substance in the cigar later tested positive for marijuana. (Tr. Vol. 1 a 31; Ex. A at 5.) Officer Young testified that the burnt cigar was not in any package when he collected it, but that he found a cigar package in the door panel that seemed to belong to the cigar, and he put the burnt remains of the cigar in the wrapping. (Tr. Vol. 1 at 32, 61; Tr. Vol. 2 at 23, 38-39.) Valenzuela testified that all she had seen in the car was a new, unopened cigar wrapping in the door compartment, and that she hadn't seen an unwrapped or burnt cigar. (Tr. Vol. 1 at 86.)

Pecina argues that the cigar was not loose in the door panel, but already in the wrapping with the odor smothered, because no experienced officer would so mishandle evidence by putting a burnt cigar in a cigar wrapping found in the same door panel. (DE 53 at 4-6.) Officer Young testified that he is not an evidence technician, and he routinely collects evidence without using official evidence bags. (Tr. Vol. 1 at 61-62; Tr. Vol. 2 at 21-23.) Agent Robert Leary, Drug Enforcement Agency Task Force Officer at the Hammond Police Department, testified that it is accepted practice in the Hammond Police Department to secure evidence in any way it can be safely taken to the police station without destroying it, where it is then sealed in evidence bags. (Tr. Vol 2 at 40.) So as to secure it, it seems reasonable that an officer would put a used cigar into the

empty, resealable cigar packaging found with it, especially when both items are evidence. Pecina didn't suggest any source of actual contamination of evidence, and I don't see one.

After the Charger was searched, Pecina and Valenzuela were separately taken to the police station. (Tr. Vol. 1 at 33-34.) Officer Young testified that, during the drive, Pecina made additional spontaneous statements, including "she's got nothing to do with this" and "it's on me." (Ex. A at 5; Tr. Vol. 1 at 34.)

Permit me now to step back for a moment to describe how exactly the Dodge Charger (and Pecina and Valenzuela) got to that Hammond motel on the morning of their arrest. The story is hazy. What they were doing in Hammond, who they were staying with, and how they acquired money during their months-long visit remain mysteries after Valenzuela's testimony. For instance, Valenzuela testified that she and Pecina and their child stayed in Hammond for months with Pecina's aunt, who had picked up Valenzuela when she arrived at O'Hare Airport. Yet Valenzuela didn't know the aunt's name. By contrast, another witness testified that Pecina was staying with a woman in her late twenties named "Laura." (*See, e.g.*, Tr. Vol. 1 at 76-79, 84-85, 87, 92, 116-117.) These particulars are immaterial to this motion, but the contortions and half-truths laced throughout Valenzuela's testimony made it evident that her account of events must be treated with extreme caution on even the most basic of points. *See United States v. Edwards*, 581 F.3d 604, 612 (7th Cir. 2009).

During his long visit to the area, Pecina apparently bought the Charger. Extensive testimony was presented regarding Pecina's relationship to the car, which bears on his privacy interest in the car and his resulting standing to challenge the search and move to suppress evidence. To call the story of the car a bit odd doesn't quite do it justice; it's actually stranger than fiction, but it requires only brief description here. The car's previous owner, Chelsey Kerr, drove from Iowa to Hammond around October 2013. When she got here she spent the night with Pecina in a hotel room bankrolled by Pecina's friend Justin Jones; the next day she sold the car to Pecina, eventually signing over the title. (Tr. Vol. 1 at 97, 109-111, 114, 120; Ex. R.) For reasons that are entirely unclear, Kerr later reported the car stolen, although that report was determined to be unfounded. (Exs. 6, P, Q; Tr. Vol. 1 at 35-36, 63.) Jones agreed to take care of the title of the car for Pecina, because, according to Jones, Pecina "didn't want it in his name" because Pecina didn't have a license. (Tr. Vol. 1 at 109, 115 .) The problem with Pecina's request was that Jones "had too many cars in his" name (*id.*), so he asked Sara Klee, his friend's girlfriend's ex-stepdaughter, whom he had met during the preceding month, to title the Charger in her name in exchange for allowing Klee to use one of Jones's cars, a greenish car that may have been a Subaru. Klee's name was on the title to the Charger, but she never touched the Charger after going with Jones to get insurance and license plates. (Tr. Vol. 1 at 34, 95-98, 100, 102, 109, 113, 117.)

Despite this muddled saga, it appeared from the testimony that the car really was Pecina's, and he had full use of it. (Tr. Vol. 1 at 34, 95-96, 98, 114.) The contents of

the car when it was impounded belonged to him, not to Klee. And there was a child's

carseat in the back that Valenzuela said she and Pecina had borrowed from Pecina's

aunt for their child, which is plausible. (Tr. Vol. 1 at 82.)

## ANALYSIS

The Fourth Amendment protects people's right to be free from unreasonable

searches and seizures. A police officer can't stop a car and detain the occupants, even

temporarily, unless the officer has probable cause to believe that a crime, including a

traffic violation, has occurred because such a stop qualifies as a seizure. *See, e.g.*, *Whren*

*v. United States*, 517 U.S. 806, 809-10 (1996); *Carmichael v. Vill. of Palatine*, 605 F.3d 451,

456 (7th Cir. 2010). An officer also can't arrest a person without probable cause to

believe that person committed a crime. That is, "[a] warrantless arrest of an individual

in a public place for a felony, or a misdemeanor committed in the officer's presence, is

consistent with the Fourth Amendment if the arrest is supported by probable cause."

*Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (citations omitted). Once someone is under

arrest, law enforcement officers may conduct a search incident to the arrest, but may

only search the space within the arrestee's immediate control to prevent the arrestee

from accessing either a weapon or evidence that the arrestee can then destroy. In the car

context, law enforcement may also search a car incident to the arrest of an occupant of

the car "when it is reasonable to believe that evidence of the offense of arrest might be

found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 335 (2009).

A criminal defendant may move to suppress evidence that law enforcement obtained due to an illegal search or seizure. If a search or seizure is no good, then all of the evidence obtained as a direct or indirect result will be excluded as the fruit of the poisonous tree. The taint attaches broadly to any evidence obtained by law enforcement's illegal act, and can cover physical evidence and statements. *Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963); *United States v. Conrad*, 673 F.3d 728, 732 (7th Cir. 2012).

As a threshold matter, a defendant can't move to suppress evidence seized in an illegal search unless he had a legitimate expectation of privacy in the area searched. *United States v. Torres*, 32 F.3d 225, 230 (7th Cir. 1994) (citing *Rakas v. Illinois*, 439 U.S. 128 (1978); *United States v. Duprey*, 895 F.2d 303, 309 (7th Cir. 1989), *cert. denied*, 495 U.S. 906 (1990)). He can only assert a violation of his own Fourth Amendment rights, not anyone else's. *United States v. Padilla*, 508 U.S. 77, 81 (1993).  In other words, only a person whose own rights have been violated has standing to move for suppression.

The Charger's provenance makes mud seem clear. According to Jones there was some problem with Pecina's license that prevented him from owning a car, so Pecina set up a proxy to circumvent the problem. I expect we'll never understand exactly why Chelsey Kerr drove the car from Iowa to Hammond or sold it to Pecina, or why Jones engineered the transfer. Klee's and Jones's stories had huge holes in them, and, like Valenzuela, I didn't find either of them particularly credible. Still, the sum of the testimony does convince me that neither Klee nor Jones had control over or regular use

of the Charger, and that Pecina did. Despite the obvious machination in ownership, it does appear that Pecina had a legitimate privacy interest in the car. As a result, I find that Pecina does have standing to challenge the search and to move to suppress the evidence.

Moving on to whether suppression is appropriate, the resolution of Pecina's motion requires that I decide whether, when, how, and why Officer Young could permissibly detain Pecina, and whether, when, and why Officer Young could legally search the vehicle. A police officer's actions in a stop are adjudged objectively by asking whether a reasonable officer in the officer's position at the time could have believed he had probable cause to act, which means a reasonable ground for belief of guilt. *Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003) ("[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt . . . . To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." (internal quotation marks, citations omitted.)). Odd as it may seem, even the officer's misinformation (so long as the information was reasonably trustworthy) and "the subjective motivations of the officer do not invalidate a search otherwise supported by probable cause" because the probable cause inquiry is entirely objective. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010) (citation omitted); *see also United States v. Beltran*, 752 F.3d 671, 678 (7th Cir. 2014).

The clearest way to assess the constitutionality of Officer Young's actions is to walk through the stop, arrest, and search chronologically, so that's how I'll proceed.

**A.      The Traffic Stop**

First, the traffic stop itself. To stop a vehicle for a traffic infraction, an officer must have probable cause to believe the driver committed a traffic violation. *United States v. Moore*, 375 F.3d 580, 583 (7th Cir. 2004) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996)). Once it is established that the officer had probable cause for a traffic stop, whatever other subjective, underlying reasons the officer may have had are irrelevant to the legality of the stop. *Id.* at 583 n.1. In Indiana, an officer may stop a vehicle for having a "rear back window" tinted to such an extent that "the occupants of the vehicle cannot be easily identified or recognized through that window from outside the vehicle." I.C. § 9-19-19-4(c). An officer may also stop a vehicle for turning without signaling. I.C. § 9-21-8-25.

I note that while Pecina developed evidence to challenge both the tinting and failure to signal rationales for the stop at the hearing, he appears to concede the tint issue in his supplemental briefing. (DE 53 at 1-2 ("Based on the tint of the back windows of the Dodge Charger, it appears Detective Young had probable cause to conduct a traffic stop of the Charger.").) Based on the evidence, I find probable cause existed for both bases for the traffic stop, so I will address the issue briefly despite the concession.

Officer Young wrote in his report and testified that Pecina's Charger had windows on which "the tint was dark to the point where I could not see inside of the

vehicle to identify occupants or see if the individuals were wearing seatbelts." (Ex. A at 2;Tr. Vol. 1 at 12, 42-43.) Officer Young also wrote in his report and testified that the driver of the Charger, after leaving the Best Western lot, appeared to observe the unmarked police vehicle and quickly turned into the Motel 6 lot without signaling the turn. Valenzuela testified that she knew she signaled that day because she "frequently" (not "always" or "habitually") uses her turn signal when she drives. (Tr. Vol. 1 at 70.)

I found Officer Young to be very credible, notwithstanding his mistakes on certain non-determinative details. Valenzuela's story, on the other hand, didn't hold together on even the most basic points (like who she stayed with during her months-long visit to Indiana), and was shown by the surveillance video to be patently false with respect to the material issue of whether Officer Young's police car had its lights on during the traffic stop. I believe that Officer Young saw the violations and reasonably believed he had probable cause for the traffic stop, so the stop was warranted.

One last point on the validity of the traffic stop is the fact that when Officer Young actually approached the Charger, the Charger was parked. Pecina argues that "it is not clear that the occupants [of the Charger] were aware that Detective Young was conducting a traffic stop." (DE 53 at 12.) The surveillance video proves otherwise. The video shows that the Charger was parked for mere seconds before Officer Young pulled up behind it with his lights flashing. Pecina's reaction to the police car indicates he recognized the traffic stop at that point, and yet he didn't stop. And as Valenzuela

exited the Charger she craned her head over her shoulder to look at the police car, indicating she had seen it before she started to get out of the Charger.

## B.    Pecina's Detention

After initiating the traffic stop, Officer Young handcuffed Pecina and put Pecina into the police car. This could have been legal as either an arrest supported by probable cause, or as part of an investigatory *Terry* stop supported by reasonable suspicion. *See Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). The government alleges there was probable cause for the crime of resisting law enforcement (as well as an additional offense that I needn't discuss). Resisting law enforcement is a misdemeanor under Indiana law, and it includes a person's "flee[ing] from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop." I.C. § 35-44.1-3-1(a)[3]; *see also Cole v. State*, 475 N.E.2d 306, 309 (Ind. 1985).

The question I must answer is whether Pecina's brief attempt to flee, after getting out of the car, qualifies as resisting law enforcement. To be sure, an order by a police officer to stop in a traffic situation applies to the car's driver and its passengers because once a lawful stop is made the driver *and any passengers* in the car are "subject to the officer['s] custody and control until [the officer's] safety [can] be assured." *United States v. Moore*, 375 F.3d 580, 583 and n.1 (7th Cir. 2004) (citations and quotation marks

---

[3] A revised version of this law went into effect on July 1, 2014. The relevant section of the law did not change.

omitted); *see also Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997) ("an officer making a traffic stop may order passengers to get out of the car pending completion of the stop" because danger to officer is greater when there are passengers in addition to driver, intrusion on passengers is minimal). A passenger in a car involved in a traffic stop may be questioned by the police "without [law enforcement's] questions being deemed a 'seizure' for Fourth Amendment purposes (and thus perhaps requiring reasonable suspicion or probable cause to justify the questions being asked at all)." *Moore*, 375 f.3d at 583 (citations omitted).

During the traffic stop Officer Young had custody and control over both driver Valenzuela and passenger Pecina, and his police lights identified him as a police officer and served as a valid order to stop. *See United States v. Moore*, 375 F.3d 580, 583 and n.1 (7th Cir. 2004); *Cole v. State*, 475 N.E.2d 306, 309 (Ind. 1985) ("The Court of Appeals of Indiana has held, and we agree, that the meaning of this statute is that both the police officer's identification and his order to stop may be accomplished by acts visible to the defendant."). The surveillance video shows that Officer Young had his car's police lights turned on as he pulled behind the Charger and stopped. Pecina initially got out of the Charger and moved towards the back of the Charger, then appeared to see the police vehicle with its lights on and effected a quick about-face. At that point Officer Young verbally identified himself as the police and commanded Pecina to stop, according to both Officer Young's testimony and Valenzuela's. The video shows Pecina walking quickly away from the police vehicle. Because the video doesn't have sound it's

impossible to say how much time passed between the verbal command and Pecina's halt — but it couldn't have been long because Pecina didn't go far. But that is irrelevant. Under Indiana law, police lights can serve as police identification and a command to stop. It is evident in the video that when Pecina saw the police car with its lights on pull up right behind the Charger, blocking the car's movement, Pecina fled, albeit briefly.

Whether a viewer of the video would, in hindsight, agree that Pecina was fleeing (and I think the quick 180 when he saw the police lights shows he was), the relevant question here is whether a reasonable officer could have believed he was at the time of the incident. Officer Young testified that he knew the area he was in to host significant drug and prostitution activity, he observed the Charger make what he considered a too-brief stop at the Best Western, he believed that the Charger was trying to avoid police attention, and he observed the Charger park in the Motel 6 lot and the passenger hurry out and move towards Officer Young's car then spin away once he saw the police lights. A reasonable officer could well have believed that Pecina was trying to flee. Officer Young therefore had probable cause to arrest Pecina for the misdemeanor of resisting law enforcement, committed in Young's presence. The statements Pecina made while being handcuffed and put in the police car will therefore not be suppressed.

Pecina cited one case to refute probable cause for resisting law enforcement, but that case is entirely distinguishable, as it turns on a person's duty to stop in response to a police command. In *Bovie v. Indiana* the defendant claimed that the dual alleged bases for an investigatory stop – a traffic violation and suspected drug activity – were both

invalid. 760 N.E.2d 1195, 1197-98 (Ind. App. 2002). The reasoning regarding the latter is irrelevant here, as the Charger's traffic violations provided sufficient basis for the stop. The traffic stop in *Bovie* wasn't valid because the court held that Indiana Code § 9-30-2-2 required an officer making a traffic stop to be wearing a uniform and badge or to be driving a clearly marked police vehicle, and the officer who stopped Bovie was wearing plainclothes and driving an unmarked car. An invalid investigatory stop creates no duty to stop. *Id.* at 1197. I have determined that Officer Young's traffic stop was valid, so Pecina, as a passenger in the car, did have a duty to stop, unlike Bovie, and his failure to do so constituted resisting law enforcement.

Let's suppose for the moment that Officer Young lacked probable cause to arrest Pecina for resisting law enforcement. The issue would then be whether Officer Young had a reasonable suspicion to detain Pecina under *Terry*. While conducting a stop at gunpoint and handcuffing a person subject to a stop aren't, and certainly shouldn't be, the norm, the Seventh Circuit has been very clear that neither of those uses of force by a police officer automatically transforms a stop into an arrest. Detention may be reasonable in a *Terry* stop if the subject is a flight risk. *See, e.g.*, *United States v. Howard*, 729 F.3d 655, 661 (7th Cir. 2013) ("Handcuffs in a *Terry* stop and frisk are not and should not be the norm. Their use is not always unconstitutional, though, at least where police officers can point to specific reasons for believing that handcuffing the particular person during the stop was needed for safety or to prevent flight." (citations omitted.)); *Rabin v. Flynn*, 725 F.3d 628, 639 (7th Cir. 2013) (Rovner, J. concurring) ("A second line of cases

has relied on the risk of flight to justify the use of handcuffs while the detained individual is being questioned." (collecting cases)); *United States v. Glenna*, 878 F.2d 967, 972-73 (7th Cir. 1989) (broad discussion of extent of permissible force in *Terry* stop, citing Ninth and Eleventh Circuit cases finding handcuffs don't automatically convert stop into arrest, citing Seventh Circuit case holding that conducting stop at gunpoint was reasonable under the circumstances).

The key is the reasonableness of the officer's use of force under the circumstances. *Jewett v. Anders*, 521 F.3d 818, 824-25 (7th Cir. 2008). One fact to keep in mind in considering an officer's use of force is that traffic stops are dangerous for law enforcement. In 2012 (the most recent reported year) they resulted in eight felonious killings and 4,450 injuries to law enforcement officers. Federal Bureau of Investigation, Uniform Crime Reports: Law Enforcement Officers Killed and Assaulted, Tables 21, 68 (2012) (accessible at http://www.fbi.gov/about-us/cjis/ucr/leoka/2012).

The surveillance video indicates that Pecina initially moved away from the police car. Officer Young testified that his training and experience led him to interpret Pecina's movement as a precursor to making a run for it, and Officer Young was alone with both Pecina and Valenzuela. Handcuffing Pecina and putting him in the police car were reasonable actions even as part of a stop, rather than an arrest, because Officer Young believed that Pecina might try to flee. Officer Young asked Pecina exactly the identifying questions typical of a *Terry* stop (the video confirms he didn't talk to Pecina for long), then went to ask the same questions of Valenzuela.

So although I've found that probable cause was present for an arrest, even if there wasn't probable cause, Officer Young's initial detention of Pecina was also consistent with a *Terry* stop. In sum, the stop and handcuffing were legal, so Pecina's statements while being handcuffed and put in the police car won't be suppressed.

### C.     The Car Search

Whether Officer Young arrested Pecina when he first put Pecina into the police car, or he only secured Pecina for a *Terry* stop, Officer Young couldn't legally search the Charger unless he smelled marijuana emanating from it. Under *Gant*, neither the traffic violations nor resisting law enforcement could be evidenced by any item in the car, and the government hasn't claimed that Officer Young needed to search the car for weapons or destructible evidence that might have been accessible to Valenzuela (and recall that Pecina was handcuffed and in the police car, so he couldn't reach anything in the Charger).

Officer Young says he smelled marijuana when he got out of his car and ran to intercept Pecina. The parties dispute whether Pecina left the passenger door open when he got out, and whether it was open for only a moment, or whether it remained open while Officer Young intercepted Pecina. I think the video shows Pecina closing the car door. While marijuana has a distinctive and strong odor and it's hypothetically possible Officer Young smelled it as he exited his car, pulled out his gun, verbally identified himself and ordered Pecina to stop, ran around the car next to the Charger, and detained Pecina, I think it's more likely that Officer Young conflated his later scenting of

marijuana with the earlier time period. I don't think that conflation is intentional on Officer Young's part as Pecina contends (DE 53 at 7), and I don't see it as a deliberate falsehood.

After placing Pecina into the police car, Officer Young moved to the driver's-side door of the Charger to talk to Valenzuela. During that conversation he confirmed that Pecina had lied about his own name and date of birth when Valenzuela told Officer Young Pecina's real name and presented Pecina's driver's license. Officer Young spoke to Valenzuela, who was sitting in the driver's seat, through the open driver's-side door. Regardless of whether Officer Young had smelled marijuana earlier as he pursued Pecina, he had a full opportunity to smell it during his conversation with Valenzuela.

Pecina argues that the circumstances refute Officer Young's allegation that the car smelled of marijuana at all. Specifically, Pecina argues that the 7:30 a.m. traffic stop would have meant very early morning marijuana use, which he claims is unlikely, and that there is no evidence that Pecina or Valenzuela appeared to be under the influence. Pecina also claims that he had the car washed and the interior vacuumed the evening before the traffic stop, so there wouldn't have been any lingering marijuana smell from before the wash, and he wouldn't have immediately sullied the car with the smell of marijuana and an unwrapped blunt in the door compartment. He also argues the air freshener would have masked any marijuana smell. (DE 53 at 2-3.) He also notes that no matches, lighter or ashes were noted as recovered from the vehicle, and that the tiny cigar stub was too small to emit a strong odor. (DE 53 at 4, 7.) Pecina argues that the

surveillance video shows that Officer Young didn't immediately respond to the smell of the cigar in conducting his search, as he would have done if it were emitting a strong odor. (DE 53 at 3, 7.) Pecina also notes that no evidence has been presented that any officer other than Officer Young smelled marijuana. (DE 53 at 4.) Finally, Pecina alleges that Officer Young didn't place the exposed cigar in a plastic wrapping, as Officer Young says, but rather that the cigar was already in the wrapping, because placing the cigar in the wrapper would have violated evidence-handling best practices, and it is unlikely that the officers would have rearranged evidence and failed to use proper evidence bags. If the cigar was in the wrapping, Pecina claims, the smell would have been smothered. (DE 53 at 4-6.)

I find Pecina's arguments unconvincing. On the most basic level, Pecina decries the lack of corroboration for Officer Young's statement that he smelled the odor of smoked marijuana coming from the car, but this ignores the simple fact that the statement is corroborated by the *presence of a mostly-smoked marijuana cigar in the car*. Furthermore, I see no basis for concluding that Pecina and Valenzuela wouldn't have smoked marijuana first thing in the morning; such activity is apparently so commonplace it has been colloquially assigned the term "wake and bake" (*Wake and Bake Definition*, URBANDICTIONARY.COM, http://www.urbandictionary.com/define.php?term=wake%20and%20bake (last visited August 4, 2014)). Simply arguing that it was too early to get high is unavailing.

As for the other arguments, Pecina doesn't claim Officer Young was under any obligation to administer a field sobriety test, so I don't derive any significance from the fact that he didn't – sobriety wasn't the issue at that point. (Tr. Vol. 1 at 62.) No other officers who were present for the incident testified, so there's no suggestion they didn't smell marijuana. As for the evidence of the carwash, while it is all conjecture at this point, it just as easily could cut against Pecina's argument — the cigar appears to be spent (defense briefing describes it as "a single, small, leftover blunt" (DE 53 at 7)), and if it had been like that before the carwash visit it would likely have been vacuumed up or thrown in the garbage in the usual trash purge that occurs at the carwash. The fact that it was there in the morning suggests that it was used between the evening carwash and the morning traffic stop. The fact that it was so small and there was so little left after the rest had been smoked corroborates the fact that the whole car would have smelled of marijuana.

In sum, Officer Young was a credible witness and I believe that he smelled the odor of marijuana coming from the car as he spoke to Valenzuela with the car door open. That provided probable cause to believe the occupants of the car possessed marijuana and to arrest them, and a search of the car was legal because it was likely the Charger contained marijuana (evidence of the crime of possessing marijuana). *See United States v. Peters*, 743 F.3d 1113, 1117 (7th Cir. 2014); *United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008); *United States v. Wimbush*, 337 F.3d 947, 951 (7th Cir. 2003). The physical evidence found in the car will not be suppressed.

After legally searching the car based on smelling the odor of marijuana, and finding the mostly-consumed marijuana-scented cigar and distribution quantity of crystal methamphetamine, Officer Young had ample reason to arrest Pecina for drug crimes, as well as for the initial crime of resisting law enforcement. *See, e.g.*, *Maryland v. Pringle*, 540 U.S. 366, 372-73 (2003) (holding that cocaine kept in passenger area of car was accessible to all three occupants, and any or all three could have knowledge of control over drugs, so reasonable officer could find probable cause to arrest any or all occupants). The arrest was valid on the grounds of both resisting law enforcement and illegal drug possession, so Pecina's later statements will not be suppressed.

## CONCLUSION

For the foregoing reasons, Pecina's Motion to Suppress Evidence is **DENIED**. (DE 21.)

**SO ORDERED.**

ENTERED: August 4, 2014

/s/ Philip P. Simon
**PHILIP P. SIMON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**