## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **2:13-cr-00146** |
| | ) | |
| LUIS PECINA | ) | |

## OPINION AND ORDER

Luis Pecina is charged with possessing methamphetamine with the intent to distribute it. The government has weighed and analyzed the alleged drugs the police seized when they arrested Pecina, and now Pecina wants his own expert to weigh and test the drugs pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E). (DE 59). The problem is that the parties can't agree on the best way to get this accomplished. They have each submitted briefing and proposed procedures, and also presented their arguments at a hearing. Some of the procedure for re-testing is uncontested. The points of contention are what portion of the drug evidence the defense expert will test (and who will select that sample), what testing method the defense expert may use, and whether a government agent may record some portion of the defense expert's work.

The first issue relates to the fact that the alleged methamphetamine, when seized, was in seven different packages, so the parties disagree about how to decide what portions from which packages to test, and whether the defense must test the government-created composite sample, or whether the defense may choose its own sample. The defense argues that the creation of the composite could determine the chemical composition, while the government argues that any such effect would have no

impact because neither the quantity nor the purity of the drugs is anywhere near a threshold amount for changing the criminal charge or sentence. The parties also disagree about whether the defense expert should be required to use a particular method for testing the composition of its sample. The government argues that defense experts often test drug evidence using a method that tends to indicate a lower purity than the government's preferred method, and that testing different samples using different methods will yield conflicting results that can't be meaningfully compared to one another. The government filed a supplemental brief that states that the government's lab tests are conducted in accordance with Best Practices established by three independent organizations, and that testing a composite of multiple packages is the standard method of testing multiple-unit exhibits; it was supported by attachments addressing the science of drug exhibit testing. (DE 66.[1]) Finally, the government wants its agent to record the defense expert's work so that a government expert can review the video for errors or adulteration of the evidence.

There is not a lot of precedent available to help me decide exactly what procedures should be followed in this situation. Frankly, as far as I can tell, the parties usually come to an agreement regarding procedures for defense analysis of drug evidence, and jointly submit to the court a stipulated order. I've approached this matter using a few guiding principles. A district court has discretion over discovery

---

[1] The government's motion to file this supplemental briefing is **GRANTED**. (DE 66.)

procedures, and appellate courts review those decisions for abuse of discretion. *See, e.g.*, *United States v. Herrera*, 366 Fed. Appx. 674, 676 (7th Cir. 2010); *United States v. Stevens*, 380 F.3d 1021, 1025 (7th Cir. 2004). Federal Rule of Criminal Procedure 16 requires the government to permit a defendant to inspect tangible objects, or a portion thereof, that the government controls or possesses, and that are material to preparing the defense or that the government intends to use in its case-in-chief. Fed. R. Crim. P. 16(A)(1)(E). "In cases involving a controlled substance, a concomitant part of the examination or inspection is the right of the accused to have an independent chemical analysis performed on the seized substance." *United States v. Butler*, 988 F.2d 537, 543 (5th Cir. 1993) (quotation marks, brackets and citation omitted).

The quantity of the drugs is relevant, and most likely will be offered in the government's case-in-chief, because it must be proved to a jury and it will impact the charge (possessing 50 grams or more of a methamphetamine mixture with intent to distribute). *See United States v. Washington*, 558 F.3d 716, 719 (7th Cir. 2009) ("[A] jury must find beyond a reasonable doubt any fact other than a prior conviction that increases the penalty for a crime beyond the prescribed statutory maximum." (internal quotation marks, brackets omitted.)) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). What's more, should the defendant be convicted, the defendant's advisory guideline range can be greatly impacted by the purity of the substance. This is because a purer form of methamphetamine — known colloquially as "Ice" — will result in a longer possible advisory sentence. *See* U.S.S.G. §2D1.1(c), Notes to Drug Quantity Table,

3

n. C; *see also United States v. Arechiga-Mendoza*, No. 13-1082, 2014 U.S. App. LEXIS 8817, at *11-13 (10th Cir. May 12, 2014). (DE 63 at 3.)

In exercising discovery rights, the rules apply to both parties: "[r]ules about pretrial discovery in criminal prosecutions must apply to prosecutors as well as to defendants. Access provided to private experts retained by the prosecution must be provided to private experts retained by the defense." *United States v. Shrake*, 515 F.3d 743, 747 (7th Cir. 2008) (citing *Wardius v. Oregon*, 412 U.S. 470 (1973)). Both parties have an interest in developing evidence to use at trial. However, the government obviously has additional interests in safeguarding evidence that is, in itself, illegal, and also in protecting the demonstrable integrity of the evidence through proper chain of custody practices. *See, e.g.*, *United States v. Prieto*, 549 F.3d 513, 520-21, 524-25 (7th Cir. 2008).

I have considered both parties' arguments and the case law, and this Order lays out the procedure that will be followed for Pecina's expert's analysis of the drug evidence. Most of it is simply consolidation of uncontested procedures proposed by the parties in their briefing and at the hearing. I have attempted to balance the government's interest in safeguarding the evidence with the defense's interests in having equal access to evidence and a full and fair opportunity to defend the case.

I agree with the defense that it may challenge any part of the government's testing, including both the selection of the sample and the chemical analysis. The defense expert may therefore take her own representative sample of the evidence. The sample each expert tests may be different, but they are both intended to represent the

4

whole exhibit, and can be compared on that basis. (DE 66-1 at 35.) Each expert can be questioned in court about how she selected her sample, and will have to justify her methodology.

Similarly, I also agree with Pecina that his expert may use any method she chooses for analyzing her drug sample, subject, of course, to analysis of the methodology for reliability under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 583 (U.S. 1993), and to cross examination in court during pretrial, trial, and (if applicable) sentencing proceedings. It is the attorneys' job to ensure that the jury and the Court understand the different methodologies and the merits of each, and can make an informed decision as to which expert evidence to trust. If the expert reports are not meaningfully comparable, the attorneys can make that argument and present evidence to support it; I'm not going to decide that up front on the government's say-so without evidence or explanation.

The government's explanations of the relevant science in its supplemental brief don't convince me to constrain the defense's access to retesting beyond the procedure described in this Order. The government has shown that its testing procedures are standard, and there is certainly strong evidence that its results are reliable. What the government hasn't shown is that there is no other, different method of testing that would also be reliable (maybe more reliable), or that its sample was exactly representative of the whole. By its nature, composite testing isn't absolutely precise, and there is some element of randomness based on the creation of the composite. (*See* DE66-

1 at 35.) The government didn't provide evidence that, when people are in possession of large amounts of drugs, the drugs tend to be uniform – one can imagine a drug courier having different drug purity options to sell at different prices. All the government's lab report really says is that all seven packages contained methamphetamine, and the particular composite that the government expert created was 100 percent pure, give or take 3.5 percent (noting, of course, that it obviously can't be more than 100 percent pure). Whether composite testing is appropriate and reliable isn't the issue – the defense hasn't argued against composite testing. The issue is whether the defense expert can select her own sample, and can decide whether or how to form a composite, and how to test that sample. If the two sets of results are reported in different units of measure, or are tested in different forms, the government expert should be well positioned to explain the differences after the defense makes its required evidentiary disclosures.

The exhibits the government provided with its supplemental briefing don't convince me, either. Based on their contents, I'm not even sure they address our issues head-on. The introduction to the 2009 United Nations Office on Drugs and Crime Guidelines on Representative Drug Sampling states that the guidelines assume relatively homogeneous material, and don't deal with "tactical sampling," which arises when, for instance, the materials to be tested are in different packages. Furthermore, the guidelines explicitly do not give advice at the local, regional or national level:

> The present guidelines describe a number of sampling
> methods, from arbitrary methods to methods with a
> statistical background. They focus on sampling in cases

> where large numbers of relatively homogeneous material are available. **They do not deal with so-called tactical sampling,** which may be applied for house-searches or in clandestine laboratory investigations. **These cases are characterized by different materials, sometimes in different amounts, different packages** and/or sometimes with different suspects; **these cases are considered as so specific and so dependent on the situation (also in legal aspects) that a guideline would be inadequate in many cases.** Thus, **the present guidelines contain a number of sampling strategies for cases with large numbers of items of relatively homogeneous material**. However, **from the descriptions of the sampling methods, it is not automatically clear which strategy should be preferred (or would be optimum).** This is mainly due to the fact that it is not possible to define a sampling strategy, if the requirements have not been defined. This is the main reason why **it was decided to refrain from giving advice at local, regional or national level.**
> . . .
> Since sampling is often carried out by police and customs, **the guidelines refrain from giving advice where the number of samples must be calculated for each separate case**; this would be confusing and bother law enforcement personnel with computers or lists with Bayesian and hypergeometric tables.

(DE 66-1 at 9 (emphasis added).) Furthermore, while testing a representative sample is accepted practice, the specific procedure "is left to the direction of the examiner." (*Id.* at 15.)

The government's second exhibit, an article entitled "Representative Sampling of Drug Seizures in Multiple Containers," seems to address how many samples should be tested and how many need to be positive to infer that a particular percentage of the exhibit contains the controlled substance. It doesn't provide guidance regarding where in a bag of methamphetamine to draw the most representative sample (e.g., a big rock

7

versus some portion that was pulverized when the drug was broken up and packaged), or how to decide how much to select from each container (each of which might contain a different quantity). The article seems more applicable to situations in which a large number of packages must be tested (the example used is figuring out how many out of 150 packages contain cocaine base), where the question is whether the drug is present, not how pure the drug is. In fact, the article doesn't address purity at all.

As for the government's request to record the defense expert's work, the same reasoning regarding treatment of expert testimony applies as it did to the method of sampling and testing. Videotaping won't aid in safeguarding the evidence, but might give the government an unfair advantage in discrediting the defense's expert. The government agent will safeguard the exhibit and make sure that the defense expert merely reweighs and takes samples and doesn't adulterate the rest of the exhibit, but videotaping is unnecessary to meet that end. The government shouldn't get a leg up in discrediting the defense expert's analysis by having a video of her work to criticize in court where the defense did not have the same opportunity. Any expert's report or testimony can be challenged via appropriate means before or at trial. The government can question the defense expert in court about her methodology and practices, as the defense can do with the government's expert.

For the foregoing reasons, I **ORDER** the parties to comply with the following procedure for Pecina's reanalysis of the drug evidence identified as DEA Laboratory No. 5221334 Exhibit Number 2:

(1) At a time mutually agreed upon by the government and the defense expert, a government agent will bring the entire exhibit to Pecina's expert at Forensic Analytical Sciences, Inc., 3777 Depot Rd., Suite 403, Hayward, California 94545. Defense counsel has warranted that Forensic Analytical Sciences, Inc. is duly registered with the Drug Enforcement Administration pursuant to 21 C.F.R. § 1301.11 *et seq*. Forensic Analytical Sciences, Inc. and the defense expert must be prepared to present proof of adequate DEA registration in advance and to the government agent bearing the evidence. The government agent who brings the evidence will have custody over the exhibit(s) and may be present for the reweighing and sample collection.

(2) To the extent applicable, the defense expert shall execute any DEA forms necessary to receive temporary possession of the exhibit or portions thereof, including a Form DEA-12 (Receipt for Cash Or Other Items).

(3) In the presence of the government agent, Forensic Analytical Sciences, Inc. will first weigh the evidence before selecting a representative sample or conducting any qualitative or quantitative testing.

(4) Forensic Analytical Sciences, Inc. will at all times safeguard all evidence in such a manner that the integrity of the evidence will be protected.

(5) In the presence of the government agent, Forensic Analytical Sciences, Inc. will collect a reasonable quantity of the evidence as a sample to analyze.

(6) To the extent applicable, the defense expert is responsible for repackaging each exhibit in a heat-sealed envelope, which heat-sealed envelope shall be placed in a separate heat-sealed envelope, which shall be secured in such a manner that tampering will be readily observable, or repackaging the evidence as otherwise directed by the government agent with custody over the evidence.

(7) Once the sample has been collected and the evidence has been packaged appropriately, the government agent will leave Forensic Analytical Sciences, Inc.'s facility, taking with him the rest of the exhibit not part of the defense expert's chosen sample and securing it.

(8) Forensic Analytical Sciences, Inc. will return any unused portion of the sample to the government by secure carrier as directed by the government, but not to include regular mail.

(9) Forensic Analytical Sciences, Inc. will notate any quantity of evidence destroyed during testing or at any point when any of the evidence is under its control. Upon return of any unused portion or residue of the sample, the defense expert shall provide the government a Declaration Under Penalty of Perjury pursuant to 28 U.S.C. § 1746. The Declaration will be executed by the expert who conducted the inspection and weighing(s) and will state the quantity of each exhibit consumed during

analysis, if any, as well as the weight of each exhibit both received from and returned to the Government.

(10) All of the foregoing will take place within 21 days of the entry of this order.

(11) The defense will timely comply with its discovery obligations as set out in Federal Rule of Criminal Procedure 16(b) with regard to results of its independent testing.

(12) Any failure by the defense to maintain the proper chain of custody will not render DEA Laboratory No. 5221334 Exhibit Number 2 inadmissible for this reason.

## CONCLUSION

The government's motion to file its supplemental briefing is **GRANTED**, and the briefing is taken as **FILED**. (DE 66.) Defendant Pecina's motion for independent drug testing (DE 59) is **GRANTED IN PART**, pursuant to the terms of this Order.

**SO ORDERED.**

ENTERED: August 15, 2014

/s/ Philip P. Simon
**PHILIP P. SIMON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**